Inline Packaging, LLC Graphic Packaging vs. Inline Packaging, LLC Case Number 17-1776 Mr. Herman, you want four minutes for rebuttal? Yes, Your Honor. Okay. You may begin. Thank you, Your Honor. May it please the Court. Your Honor, I'd like to start with the final written decision. It's the Appendix 31. And it says, Well, Your Honor, that's not true. The petitioner didn't do any claim charts. We pointed that out in the institution in our preliminary response. And the Board, in their final written decision, still relies on these non-existent claim charts. Why is that important? We're not appealing the institution's decision. But it's important because of the mistakes that the Board made in their final written decision. And it goes to the credibility and the job that the Board did in rendering these claims invalid. Second, it says, M-E-I-M, is supported expressly by the above citations to Kloh. And then it cites to the petition 20 pages of the petition, pages 9 through 29. Your Honor, and we're going to get to whether Cato should be combined with Kloh. Maybe you should get to that. I mean, that's if you were interested. Sure. So, if you look further in the written decision, it says, Such as the number of sides, whether there are end panels, and the locations of disruption lines. And right above that, Your Honor, it talks about the apertures. So, first of all, the number of sides is important because the only reason that Dr. Sand gave why someone would combine Cato and Kloh is that she said both of them were four-sided. But Kloh is six-sided. It's not four-sided. Everything else in her declaration about Kloh and why you would combine it with Cato is just very conclusory. It would have been obvious. It would have been obvious. And as our expert, Dr. Flores, pointed out, Cato doesn't say anything about heating food. It certainly doesn't say about putting it in the microwave. Cato takes products that have already been cooked, ready to eat is the phrase he uses, and puts them in and then allows for a consumer to not get their hands dirty and to not have things leak out. There's absolutely nothing about cooking in Cato. Kloh, on the other hand, is a six-sided sleeve that discusses the MEIM. So, in the record, there is no reason that was given, no legitimate reason. So, Kloh relates to disposable microwave reactive cooking, crisping and browning packages for foods that produces thermal heating effect. So, that is about microwaving, and it's got the material that allows you to do that. That's correct, Your Honor. Okay. Why wouldn't they proceed and look at that and say, wow, if I put the material that's in Kloh and put it into this package, then I'd have something that not only I can carry food around with me, but also I can microwave it when I need to and maybe come out with good crispy toast on occasion. Well, Your Honor, it could. If you remember, in the institution decision, the petitioner argued that Cato, in view of the ordinary skill in the art and common knowledge, should be a reason why the claim should be invalidated. The Patent Office declined to institute on that. It said, no, you've got to go combine references. There's no reason in the record, Your Honor, why you would combine Cato with Kloh or Cato with Young or Cato with Winkleman. Just because Kloh has MEIM in it doesn't mean that you're going to put it into a product that contains ready-to-eat food. There's nothing about cooking in Cato. And so what you've done, Your Honor, what you read, is basically just any MEIM I can put into Cato. And then you get to the dependent claims, which the board completely ignored. If you read the decision, they never actually addressed the dependent claims, which talk about apertures, lines of disruption, and whether there are end panels. And the issue, for instance, Your Honor, with apertures, right? Cato talks all about, we want to keep your hands clean. We don't want the liquids to come out and get your hands dirty. Apertures are holes in the thing. And so what Dr. Floros, who's a graphic packaging expert, said, when I look at this, I look at Cato, there's no way I'm going to take Kloh, take MEIM, and then put it into a package that says, I don't want to have anything come out of my hands for the sanitary reasons. The other thing, Your Honor, is Cato is shaped differently. Cato is shaped kind of like the French fry box that you would get at McDonald's, and it allows for easy access. When you're trying to cook and using MEIM like you're doing in the 078 patent, it's very important that you have even cooking. So these are, as you know, used for hot pockets, and you want to make sure that the entire hot pocket, the entire croissant, or whatever it is in there, is cooked evenly. Cato's package would not permit that. Cato's package is like this. You're going to get uneven heating. Cato doesn't have a bottom seam, so you're going to get scorched. There are many differences between Cato, which is not made for cooking, and Kloh and the other references. You're not arguing teaching away, though, are you? I'm not, Your Honor. I'm saying there is no motivation to combine, and there's no reason that one of ordinary skill in the art would combine Cato with Kloh, Winkleman, or Young. Winkleman and Young, Young, and it's in our briefs, is a much different shape. Dr. Floros, who was not deposed in this case, which I don't want to let that go by without saying. We put in an expert declaration with many substantive reasons why you wouldn't make these combinations. Instead of deposing Dr. Floros, they chose not to on the morning of his deposition, and then they submitted a rebuttal declaration of Dr. Sand. Where often, all throughout her rebuttal declaration, she says, contrary to Dr. Floros' testimony. Well, Your Honor, this is supposed to be an adversarial proceeding. Why didn't they depose him and try to get admissions from him? We think the reason is because they didn't think they could because his positions were so sound. But the fact of the matter is he testified in his declaration that if you combine Cato and Young, there are seven modifications that you would need to make to come to the 07-8 claims. That is at least good testimony that you wouldn't combine the two. And then with Winkleman, we have in the record that the combination of Cato and Winkleman doesn't disclose all of the claim elements. What's missing from those two? So what's missing from the combination of Cato and Winkleman is the free edge extending in the second direction, which, Your Honor, which I talked to before. That allows the 07-8 patent to be able to cook evenly. And then the substantively equal side edges of the end panels. And this permits the package. It's an on-the-go package that you can put down, and it permits the bottom to be sturdier. So those are the things that are not in Winkleman. So we've got Clough, which is six-sided, not four-sided. We've got Young, which requires seven modifications to get to the thing. And then we've got Winkleman, which at least doesn't have to the thing. And Winkleman is a completely different package. The example given is a triangular pizza box. Counselor, these are arguments that you made to the board. Absolutely. Right? And the board rejected them. Correct. Where did the board err? Well, Your Honor, the board erred. In our view, the board came to a decision on obviousness. It was evident at the hearing that they did not believe that these claims were patentable or that there was something patentable in this patent. And they didn't really engage in argument. They didn't listen to the numerous admissions that we discussed that Dr. Sand made. And they didn't seem to take issue with the fact that Inline didn't depose Dr. Floros. And then where they really erred is on the secondary considerations. They went through the secondary considerations. I think there had been a decision that had come out recently that said to the PTAB, hey, you've got to consider secondary considerations. So they did it, and they did it in a way that undermined the secondary considerations without any evidence in the record. So legally, Your Honor, the fact is is that the board used guesswork and speculation to undercut all of our secondary considerations. The secondary considerations in this case are incredibly strong. Hot pockets, I'm sure you're all aware of them, but there are hundreds of millions of these things sold. The evidence shows that the price went up even though Nestle wanted the price to go down. The evidence shows that. But is it also true that the evidence showed that there were other factors that could relate to the price? Your Honor, I'm not aware of any other evidence that shows that there were other factors. Didn't the board point to cost of production? He did say the cost of production. That is the one piece. But in his declaration, he was deposed on this. He said that they didn't want to do a price increase, and they agreed to one. There's no increase in sales, which he says were due to the package, and we have evidence of that in the record. We have the Nestle Consumer Survey, which shows that consumers like the package. I mean, you don't have this in every case. We have a survey saying the package is driving sales of the patented sleeve. You've got blatant copying, and in their briefs, Inline wants to say that this copying isn't as bad because we didn't attempt to design around. That's crazy, Your Honors. I mean, the fact of the matter is Nestle gave them specifications. They knew it. They copied it, and then they got caught, and they got filed with a lawsuit. That can't be excused. That copying is something that is clearly a secondary consideration that's supposed to counterbalance against these things like Dr. Sand saying, oh, it would have been obvious to add MEIM to any package. Kato is the perfect package. There are differences between Kato and the 078 patent that they can't acknowledge. The in-ring cyclobenzaprine case says, understandable but improper type of constructing a selective version of the facts relating to the objective considerations so as to confirm its hunch that the asserted claims were obvious. If you had to ask me, Your Honor, what's the one legal thing they did? They decided the claims were obvious, and then they constructed a set of facts that permitted them to do that. They ignored the evidence of the record. They failed to identify a reason to combine any of the references, and then they completely undercut our secondary considerations. If you look at the final written decision, it says the weight to be afforded to this assertion is discounted heavily by many factors. And then when it concludes and goes through, it basically discounted completely the—let me find it, please. It says moderately weak evidence of commercial success. They base that on the fact that Jeff Voisey, our fact declarant, is an employee of Graphic Packaging. Your Honor, how else are we supposed to get evidence of commercial success in if we don't use a witness from Graphic to discuss the sales and the price increase and the seven-year exclusivity that Nestle gave based on our unique design? They said no persuasive evidence of failures of others. We put in the Schiffman concepts were tried. Graphic made the constructs based on the Schiffman constructs that were purchased by Nestle, and they were determined by both Nestle and Graphic to not be satisfied. They said no persuasive evidence of long-felt need. This took four years, Your Honor. All those statements to me are telling me that the PTAP did consider—the board did consider secondary considerations, just didn't find them persuasive, and we can't reweigh that, right? Your Honor— These are factual findings. Your Honor, there's a presumption of nexus here, okay? The board found nexus, and then they completely discounted the secondary considerations that we had presented. What nexus? What do you mean? They actually found in the decision, they said there is a nexus between the patented product and the claims of the patent. So they said there's a nexus, and then they completely discounted it when they weighed the secondary considerations against the weight, they said, of the obviousness. And so, Your Honor, no, you can't just rubber stamp that they say we don't think there's really commercial success here or we're going to discount it because Mr. Voisey's an employee of Graphic. I mean, that's crazy. And, Your Honor, you have to look at it in the light of— They said more than that. They said they thought that that was a self-serving statement. Well, Your Honor, I don't understand— That's a credibility-type issue. I'm sorry? That's a credibility-type issue. Your Honor, this is why you have depositions. There's nothing in the record that Inline can point to that undermines Mr. Voisey's credibility. The fact of the matter is, even if you don't like the pricing information, there's a seven-year exclusivity that Nestle granted. There's other people tried. At least Mr. Schiffman tried and failed. There's four years of when this project first started to when the commercial embodiment became a reality. They said just without any law on their side, the board says that is not evidence of long-felt need. In a crowded art like this, microwave technology, four years is forever. So— You're out of time. I'll give you two minutes for rebuttal. Thank you, Your Honor. May I please report? Chad Ziegler for Inline, packaging the appellee in this case. The board, in fact, spent about 16 pages of its opinion going through each and every piece of evidence that graphics submitted for secondary considerations. I wanted to talk to you about a few things the board said because they were kind of absurd. And sometimes the best they could do is cite some CPA case. But first, this notion that Mr. Boise's testimony, by definition, is discounted because he's an employee. The whole question is what did their own evidence show with respect to sales? So the board confuses the concept of an evidentiary principle, which says if you're an employee, that goes to your credibility, and the ultimate conclusion of whether the credibility was so tainted based on the overall assessment of one's credibility that it should affect the weight to be given at the testimony. They automatically said he's an employee, therefore no weight, period. And over and over and over, they said the same thing. I don't know if it was that stark. They're quoting the Finnegan case for the proposition that whenever you have testimony from a witness who's testifying as to what someone else said, you need something more than that testimony. But the Finnegan case said when you have a witness, when you have an inventor testifying as to inventorship, and the only corroboration is another witness's own testimony, that you still need corroboration at some point. They never said that a witness who happens to be an employee by definition is not credible and we don't give weight to what they say. That's a complete misunderstanding of how evidentiary principles work. Respectfully, Your Honor, I disagree slightly with that characterization insofar as what Mr. Boise was testifying to specifically with the testimony that was discounted was what Nestle knew, what Nestle intended, how they felt about the product when that testimony had to come from Nestle itself. It's an evidentiary issue. We moved to dismiss the evidence. The board allowed it in, but the board said, look, we'll consider it. So, for example, Mr. Boise can't say what Nestle said. But they said everything that Mr. Boise said was entitled to no weight. Everything he said violated 701, 601, 802 of the Federal Civil Procedure. The board acknowledged that it would use those rules in weighing the credibility of the testimony. All of it surrounded his post hoc interpretation of evidence. He wasn't a precipient witness. They never said any of that. They said he was an employee, ergo, we don't believe him. Right? In the context of that statement. I mean, I have to look at what the board said. They said because he is an interested witness, we're going to discount his testimony somewhat, they said, yes. Citing that case that we referred to, the Finnegan case, the quotations in that case had to do with testifying to someone else's testimony. And what I take from that is because Boise is talking about what Nestle said and what Nestle thought, that that was an appropriate objection to the testimony, whether or not the board said that. But they never once said that. Well, whether or not the board articulated it artfully, that is the problem with that evidence. And that problem remains. But they even discounted his testimony as to just the straight up numbers. Like how many sales, what the sales increase was, all of that. As far as sales increase and sales, the evidence they put in itself was admitted and weighed independently. They weren't looking for, for example, the trial of Mr. Boise to get it into evidence. They let it in. And we think that was done with much generosity. So the fact that they discounted his testimony wasn't used then to discount the specific exhibits that the board went through one by one to find serious issues with respect to the probity of the evidence, which is something that's entitled, absolutely entitled to do. Let me look at a few other things. Another thing they said is that you cannot have, you can never show failure of others when it's only one entity or person who failed. In other words, you have to show a ton of people tried it. And I have a problem with that because in the pharmaceutical context, over and over and over, we've found failure of others where one competitor tried something and couldn't get there, and therefore the failure of others is established. So why are we, and they cite some old CCPA case for this proposition, ignoring all the rest of our body of case law that says even the failure of one entity or one person is enough if that's where the interest in the product lies. So if we're talking about a case where, and I think Mr. Herman cited this case where you have a serious competitor, right, a serious competitor in the pharmaceutical industry, I think it was, it could be an Ebersol case he cited, where there's evidence that the competitor expended tens of millions of dollars in trying to design a competing drug, or a drug that could be used instead of the one that's patented, and failed to do so. In that instance, I agree, sure, you have a competitor, there's evidence, more than merely someone failing, there's evidence of the amount of money spent, there's the evidence of the competition. Right, but the board never said that, the board never said, okay, sometimes you could do this, or ever cited a single Federal Circuit case. I mean, this is my problem, they over and over and over make up rules about what the secondary considerations mean, and what you can consider, and then they state them as blanket rules that could be recited again in another case. And their statement was just plain wrong. In the context, though, of the statement that's made, I submit that with respect to an actor like Schiff, whose work was scrutinized with respect to the board's decision and statement as to how much weight to give it, you have an individual that was working collaboratively with the parties, he designed some rough sketches, according to Mr. Boise's testimony, that were then used by Nestle to design packages and tests. There's no evidence that Schiff had any further involvement, there's no evidence that Graphic went out of its way to make these things work. There's got to be some contextual evidence that gives relevance to the information, to give it the kind of weight you need to show that whereas there's a strong case of obviousness on one side, there is weight enough for secondary considerations. But the secondary considerations are part of the obviousness inquiry, it's not a question of two different sides. And motivation to combine is not an additional gram factor, it is the ultimate question. And so all of these factors are to be considered before you decide that there's a motivation to combine. You say there's evidence that would indicate the possibility of a motivation to combine, but ultimately these factors are supposed to tell you whether or not the motivation to combine really exists. I don't mean to sound trite about it, but when you're writing an opinion, you have to start somewhere. So this board started with three gram factors, the first three, and then wound up with secondary considerations, then lastly took all the evidence together and put them on a scale like Graham tells you to do. They did their job exactly right in that regard. And what they found was when you look at the evidence of obviousness, for example, you look at the 07A patent and they see two elements well known in the art, you know, a pillow box, package construct, and microwave energy interactive material. They're being combined for the exact reason that people have been using them for years and years and years, by known methods, right, to achieve results that are absolutely expected. Nothing beyond what you'd expect out of the pillow box construct and its ability to hold the food product up for consumer usage, and MIEAM, which has been around forever, at least as far as CLO goes, which shows that you can use the brown and crisp in the microwave. I submit that that's an exemplary case of obviousness under the KSR standard. And there had to have been some measure of evidence coming from GRAPHIC to show why such a combination under those circumstances, as explicitly set forth in KSR, is going to displace the decision in their favor. But even if you don't have teaching way, what about the fact, as your friend described, that if you do the combination that the board thought was so obvious, that you basically would end up with a situation where you've got holes in the product where the prior art was specifically designed to protect your hands. So KSR tells us that, with respect to Keto, you're allowed to employ Keto for more than its absolute express purpose. So Keto is used to hold a bulky food that's across many product lines, some of which may have grease, others of which may not. But the point is we're taking it from that context, and we're applying it in a situation to which our expert testified is fairly ideal usage, as far as meeting the two needs expressed by the patentee in their patent. And that is the ability to brown and crisp on the one hand, and then an out-of-the-microwave feature that allows people to carry it around and facilitate consumption afterwards. And that's exactly what it's being applied for. It's being applied for its exact reason. To raise on Detra in Keto is to do exactly that. What about the discounting of the copying? I mean, there was blatant copying. The evidence of the case shows that Nestle had a sole source supplier in graph. Right, and they handed it over to your client who copied it. We got a specification to meet, and we met it, and then the patent issues. Right, and below your only argument was that, well, it can't be copying if we didn't know about the patent. But that's not the law. But there has to be. The law says that copying itself is equivocal. Again, you need some contextual evidence to give that some meaning. So, for example, in the case. Meaning you didn't come up with it on your own. You copied it. That's one way to demonstrate that copying has probative value, is to show that, yes, we were in the marketplace with a competing product, and we were somehow being out-competed by graphic, and we decided to co-opt those features that made it better. And that's not the case here. In the case law, I think it's fairly clear. So, for example, in. Well, you did co-opt those features that made it better. You copied the actual plans. Yes, but we copied. We made a product to specification, and we were agnostic about the invention. The invention was immaterial. But that doesn't matter. That doesn't. I mean, as the board found. It does matter. So, for example, in. No, the board found that didn't matter. The board specifically rejected your argument. It did. It gave it some weight, but it did by the argument that there has to be more than bare copy. It did say that copying is equivocal. And it looked for evidence found in many cases where there's been some competitive activity, historical competitive activity between the parties, where the playing field got leveled through co-opting of inventive features of the product. It's true. The case of Wrigley versus Cadbury, where copying was shown, the Fed Circuit placed very little weight, actually, on the fact that there was copying for the sole reason that the products at issue and all of the industry actors all tended to try to make the same product. So, again, if you can show that all the decisions made with respect to our manufacture of the device and Nestle's acceptance of it could relate to business decisions, such as Nestle's desire to have a second supplier, which is a perfectly natural business decision to have that may have nothing to do with the invention, or that we were simply meeting a specification in a market, and Nestle's a market in which we are told that we have to make the exact same thing. A second source supplier makes the same thing. It doesn't mean that we looked to that invention, or Nestle did, and said, we need to have this copy. So the evidence, unless it can demonstrate that beyond their documents that they've shown or the arguments they've made, is equivocal. Lastly, what's missing, and it's important, I think, particularly here when you have a reported invention where you are combining old elements for their known purposes, for the exact reason you're combining them, which is known to everyone. There's no unexpected results. These are complementary features. One addition doesn't hinder the operation of the other. The addition of one doesn't enhance the ability of the other. They're just sort of complementary features. It's to show somehow that those known elements would not have been combined. And the best way to do that, and the only way to do that, I would submit, is to show historically that actual skilled artisans didn't actually make the combination when there was a long-felt need in the art. And in fact, the combination that the inventors had led to something unexpected. And here we don't have that. And the classic case where that was shown, where those facts are completely absent here, is the graphic-sided case of Leo Farmer products. In that case, you have the combination of two compounds, two known compounds that treat psoriasis, each of which had been for years administered separately. And the patentee demonstrated that for years there has been a very long-felt need to increase the efficacy and shelf life of those drugs. And what they did was they found that when they combined the two, unexpectedly, the combination of those two compounds, known to treat the exact same disorder, were enhanced. Shelf life and efficacy were enhanced. Facts that are absent from this case. The only evidence that they have as far as a long-felt need is Exhibit 2016, which is a document from Chef America, Nestle's predecessor, saying that they would like to have a microwave to set their sleeve with a to-go feature. And in that same document, Chef America immediately suggests the proper way to address it. Your time is up. I've let you go over. Thank you. Making up for the two minutes I gave him back. So you've got an extra two minutes, too. Oh, I have an extra two minutes. No, you did. Oh, you did already. All right. Because I saw two minutes and I was like, oh, you gave me an extra two minutes. Thank you. Your Honors, briefly, everything Mr. Ziegler said about secondary considerations was attorney argument. That's the same thing that we argued below and argued in our briefs. The Federal Rules of Evidence and all those arguments is not on issue here on appeal. The Board can weigh evidence, but it needs contrary evidence to weigh it against. There is none. It's just attorney argument. But even if all the secondary considerations go in your favor, that's something that is supposed to be considered in the totality of the circumstances here. And those circumstances include what all the prior art teaches. Correct. Why isn't in this circumstances, the totality of the circumstances sufficient when you've got the prior art that does what it does? So first of all, Your Honor, you hit on a point about when secondary considerations are supposed to be considered. It's supposed to be considered as in total. Dr. Sand did not consider secondary considerations at all. So she gave an opinion that there was a motivation to combine without addressing any of the secondary considerations. And that includes in her rebuttal declaration. Okay. So an in-touch technologies 2014 Federal Circuit case touches directly on that. If the expert doesn't identify a sufficient reason to combine and doesn't even consider secondary considerations, we're going to reverse. And that's what we submit that you should do here. The combination, Your Honor, the problem of Cato, and I'm reading from Cato, Appendix 1275. It literally says problem. If a bulky food such as a hamburger or croquette is extracted from a packaging material and is directly held, it is not preferable from the hygienic aspect and sauces and or oil of the bulky food can be smeared onto the hands and the hands can get dirty. That is the problem that Cato was trying to solve. The problem that the 078 patent was trying to solve was to develop a construct that where you could cook the food. They cook the food, carry the food afterwards prepared, and then allow for easier consumption as you're eating it. That's not a problem that Cato identified. It's not a problem that Cloe identified. So there is no reason to combine the art. And then that's when you look at the secondary considerations and say, clearly, that's going to outweigh a weak motivation to combine. All right. Thank you. The cases will be submitted.